IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CLEAVER BROOKS COMPANY, INC.,

Plaintiff and counterclaim defendant,

vs.

B&K MECHANICAL CONTRACTORS, LLC, doing business as Grunwald Mechanical Contractors & Engineers,

Defendant and counterclaimant,

and

AMERISURE MUTUAL INSURANCE COMPANY,

Defendant.

4:23-CV-3243

MEMORANDUM AND ORDER

This is a breach of contract case involving two contractors: Grunwald Mechanical Contractors & Engineers, and the Cleaver Brooks Company. The parties contracted on a government project, but fell out over Grunwald's failure to make partial payments that Cleaver Brooks thought Grunwald was required to make. Each party accuses the other of breaching their agreement, and the parties have very different views on what that agreement entailed.

The Court concludes that while Cleaver Brooks is not entirely right about the scope of the parties' agreement, it is right enough to establish that Grunwald breached that agreement. But while Cleaver Brooks has proved

liability, it hasn't proven the amount of its damages as a matter of law. Accordingly, the Court will partially grant Cleaver Brooks' motion for summary judgment on its breach of contract claim.

## I. BACKGROUND

Cleaver Brooks is a Texas corporation that manufactures boiler room products. Filing 64 at 1.[1] Grunwald is an Omaha contractor. Filing 64 at 1-2.

In 2021, the Department of Veterans Affairs contracted with Spees-Hernandez JV 2, LLC for the installation of three boilers at the Omaha VA Medical Center. Filing 73 at 27; filing 72-1 at 8-51. Their contract required Spees-Hernandez to complete its work 425 days after the VA gave Spees-Hernandez notice to proceed, and allowed the VA to withhold damages from the contract price for a failure to complete the project on time. Filing 72 at 28.

Spees-Hernandez, as the general contractor, subcontracted with Grunwald for installation of a new boiler system. Filing 73 at 28. In October 2021, Cleaver Brooks submitted a proposal ("the Proposal") to Grunwald for production of a D-Style Boiler for the project. Filing 64 at 2; filing 67-3; filing 73 at 29. The Proposal is one of the three documents central to the parties' dispute. The Proposal included "milestone payments" providing for specified percentages of the total price to be paid upon commencement or completion of certain stages of the project. *See* filing 64 at 2-3; filing 67-3 at 31. The Proposal

---

[1] Pursuant to NECivR 56.1, a party moving for summary judgment must include in its brief a statement of material facts about which the movant contends there is no dispute, and the party opposing summary judgment must include in its brief a concise response to that statement of facts, noting any disagreement. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response. NECivR 56.1(b)(1)(B).

also included a percentage-based schedule for liquidated damages if the project was canceled. Filing 64 at 3; filing 67-3 at 31.

Several months later, Grunwald decided to proceed with Cleaver Brooks and the parties began exchanging emails about the terms of their agreement. Filing 64 at 4. After receiving a draft purchase order from Grunwald, Cleaver Brooks' project manager replied that there were "a few things missing on the PO that we'd normally like to see":

- Reference to our proposal
- Desired delivery date (even if estimate)
- Milestone payment schedule
- Mutually agreed-upon legal T&C's

Filing 64 at 4; filing 73 at 29-30. Grunwald's project manager replied as follows:

- Reference to our proposal
    - We will reference this in our subcontract
- Desired delivery date (even if estimate)
    - The preliminary schedule our GC had put together had the new boilers being delivered on 11/11/2022. This schedule is being worked out with the VA but that is the date we should work toward as of today.
- Milestone payment schedule
    - We can work on a payment schedule. Are there milestones you typically use?
- Mutually agreed-upon legal T&C's
    - We will issue these in our subcontract.

Filing 64 at 4-5; filing 67-5 at 2-3; filing 73 at 30. A few minutes later, Cleaver Brooks' project manager replied, "Regarding milestone payments, our proposal contains a typical schedule on pg. 30. We are flexible and can work with you on these if needed. Our goal is to try and keep things cash-neutral for both parties." Filing 73 at 30; filing 67-5 at 1.

Grunwald sent Cleaver Brooks a draft agreement. Filing 73 at 30. After receiving it, Cleaver Brooks' project manager described it to Cleaver Brooks' director of sales in internal correspondence:

> After this morning's call with VA contractors, we now have the flowdown subcontract T&C's (attached, along with last week's signed PO).
>
> Notes:
>
> - Our proposal is now referenced in subcontract
> - They've agreed on-site date is a moving target based on our schedule (basically, they will build to our schedule)
> - They are open to milestone payments, although they are not reflected in this document
> - We need to review the rest of the legal language.

Filing 73 at 31; filing 72-3 at 3. The director of sales replied noting that the draft referenced terms and conditions "on the reverse side" that he wanted to see, because "[t]he flowdowns don't seem to capture all the normal T&C language." Filing 73 at 31; filing 72-3 at 3. So, the Cleaver Brooks project manager asked Grunwald to either provide a copy of the referenced terms and conditions or state that they didn't apply. Filing 73 at 31; filing 67-6 at 3. Grunwald clarified that the "terms and conditions" referenced didn't apply to this purchase order. Filing 73 at 31; filing 67-6 at 3.

Cleaver Brooks' project manager privately told his sales director that he liked that answer, and suggested that perhaps "the 'normal' terms missing in the subcontract are covered by T&C's in our proposal, which is referenced in subcontract?" Filing 73 at 32; filing 72-3 at 4. The sales director replied, asking,

"Think we could get him to add something like 'including applicable commercial terms' to our proposal reference?" Filing 73 at 32; filing 72-3 at 4.

So, Cleaver Brooks' project manager responded to Grunwald, noting that the draft didn't include "things that are specific to boiler equipment, like maintaining water quality for warranty, etc." Filing 67-6 at 2; filing 67-6 at 2. He suggested adding "including applicable commercial terms" to the draft's reference to the Proposal, so that it would describe the project as "Department of Veteran Affairs 4101 Woolworth Ave, Omaha NE 68105 ; Correct Mechanical Deficiencies Project 636-19-301 Purchase of D-Style Boiler 07310929-Proposal -Rev-0 Dated October 4, 2021 including applicable commercial terms." Filing 64 at 5; filing 67-2 at 2; filing 73 at 32. Grunwald replied, "Yes, that should be fine." Filing 64 at 6; *see* filing 73 at 32.

Later the same day—June 2, 2023—Cleaver Brooks' project manager contacted Grunwald asking about milestone payments:

> I forgot to ask if you would accept our milestone payments below? Your subcontract included language about submitting for progress payments, which isn't really applicable to an OEM equipment supply contract.

Filing 73 at 33; filing 67-5 at 1. Grunwald's project manager emailed his direct supervisor, a vice-president of construction, explaining:

> This is how Cleaver Brooks would like to be paid out. This would give them $300,000, basically, immediately. I don't know if the VA will approve a payment for that amount. Is there a good way to pass this on . . . to the VA? I have never seen equipment purchased this way.

Filing 67-1 at 7, 13-14; *see* filing 67-2 at 10. The VP responded that he thought the VA could be billed for those payments. Filing 67-1 at 7, 13-14; *see* filing 67-2 at 10. But that was only an internal discussion, it is not clear from the record how, or even whether, Grunwald responded to Cleaver Brooks' email asking whether Grunwald agreed to the milestone payments.

Nonetheless, on June 20, Cleaver Brooks' project manager returned the Sub-Contract Agreement to Grunwald, signed on Cleaver Brooks' behalf. Filing 73 at 33. At the same time, he signed and returned Grunwald's purchase order for a total price of $3,340,402. Filing 64 at 6; filing 67-7; filing 73 at 33.

The executed "Sub-Contract Agreement" required Cleaver Brooks "to perform certain labor and/or furnish certain material for the erection and completion of Department of Veteran Affairs 4101 Woolworth Ave, Omaha NE 68105 ; Correct Mechanical Deficiencies Project 636-19-301 Purchase of D-Style Boiler 07310929-Proposal -Rev-0 Dated October 4, 2021 including applicable commercial terms as per plans and specifications prepared by N.A., Architect." Filing 64 at 6; filing 67-4 at 1. The Sub-Contract Agreement also provided that Grunwald agreed:

> A. To include in the monthly estimate to the Owner the value of all work, labor, and materials of [Cleaver Brooks] incorporated into the project covered by the agreement for which estimates have been furnished by [Cleaver Brooks] and approved by [Grunwald].
>
> B. To pay [Cleaver Brooks] for the full, faithful and prompt performance of this contract agreement, subject to all of the terms and conditions hereof, the sum of Three Million Three Hundred Forty Thousand Four Hundred Two Dollars and 00/100 Dollars ($3,340,402.00), payment to be made as follows:

> As [Grunwald] receives payment for monthly applications for payment submitted to [Spees-Hernandez], [Cleaver Brooks]'s applications for payment must be submitted, in duplicate, by the 15[th] of each month . . . Payment will not be made unless certified payroll reports, if applicable, and all other required documents have been received and approved. Invoices received the 15[th] of the month will be processed after the following month . . . .
>
> . . .
>
> [Cleaver Brooks] shall have no claim against [Grunwald] as a result of funds delayed or withheld by [Spees-Hernandez] in accordance with the Contract Specifications . . . .
>
> . . .
>
> That the failure of [Grunwald] to make payments as and when herein provided shall in addition to all other rights entitle [Cleaver Brooks] to suspend all work and shipments during the continuance of such default on the part of [Grunwald], and shall further entitle [Cleaver Brooks] to an extension of time for the performance of the work covered by this agreement for the period for which the work was suspended.

Filing 73 at 33-34; filing 67-4 at 2; filing 64 at 7. The Sub-Contract agreement also permitted Grunwald to take over the contract, on three days notice to Cleaver Brooks, if Cleaver Brooks didn't complete or "diligently proceed" with the contract "within the time provided for[.]" Filing 73 at 34; filing 67-4 at 2. The Sub-Contract Agreement is the second of the three documents at the center of this dispute.

After Cleaver Brooks accepted the Sub-Contract Agreement, it invoiced Grunwald for $334,040.20—10 percent of the contract price, the amount that

would have been due pursuant to the milestone payment schedule contained in the Proposal. Filing 64 at 3; filing 68-1; *see* filing 67-3 at 31. Grunwald didn't pay the invoice. Filing 64 at 8. A few months later, Cleaver Brooks invoiced Grunwald for another $334,040.20, because the Proposal's milestone payment schedule called for another 10 percent of the contract price "[u]pon initial submittal of System GA & Base loading." Filing 64 at 8; filing 68-2; *see* filing 67-3 at 31. Grunwald didn't pay that invoice either. Filing 64 at 8. Grunwald had submitted those invoices to Spees-Hernandez, but Spees-Hernandez hadn't paid Grunwald for those amounts. Filing 73 at 41; filing 72-4 at 5-8.

On February 27, 2023, Cleaver Brooks notified Grunwald that it was suspending performance on the project because of Grunwald's failure to pay. Filing 64 at 8; filing 68-5; filing 73 at 103. Spees-Hernandez, however, notified Grunwald that neither the VA nor Spees-Hernandez would pay Cleaver Brooks on any schedule other than the progress payments contained in the prime contract between Spees-Hernandez and the VA, the Spees-Hernandez/Grunwald subcontract, or the Sub-Contract agreement. Filing 73 at 35; filing 72-1 at 111-12.

On April 26, Grunwald made a partial payment of $167,020.10, which was five percent of the contract price, in return for Cleaver Brooks' promise that it would resume work and provide Grunwald with a complete boiler submittal package for Grunwald to submit to Spees-Hernandez. Filing 64 at 8; filing 73 at 35-36. On June 6, while the parties were discussing an amendment to the Sub-Contract Agreement, Spees-Hernandez issued another notice of default to Grunwald. Filing 73 at 37; filing 72-1 at 128-29. Then the parties attempted to resolve their dispute with the third key document at issue here: A "Memorandum of Understanding" (the "MOU") dated June 16, 2023. Filing

64 at 8; filing 67-8. The MOU was clear about the disagreement that had arisen between the parties:

> A dispute has arisen between the parties hereto and with respect to the above-referenced Sub-Contract made on June 2, 2022 (the "Sub-Contract"). Specifically, [Cleaver Brooks] maintains it is entitled to progress payments described in its proposal for its work under the Sub-Contract, whereas Grunwald [] maintains it is only obligated to issue payment to [Cleaver Brooks] in accordance with pay-when-paid provisions within the Subcontract.

Filing 67-8 at 1. And the parties expressly recognized "that significant damages or dispute costs may result upon either being declared in default of the Sub-Contract and/or Grunwald's subcontract agreement with the project's general contractor[.]" Filing 67-8 at 1. So, the parties "reached the following understanding on payments to [Cleaver Brooks] for its work on the project[.]" Filing 67-8 at 1.

Specifically, at that point, Cleaver Brooks was demanding a "total Sub-Contract price in the amount of $3,340,402.00" subject to a request for change order "increasing the total Sub-Contract price to $3,674,442.00." Filing 67-8 at 1. Cleaver Brooks was also demanding a specific milestone payment schedule, starting with

> 10% of total Sub-Contract Value - Immediate Billing - Project to be restarted after this payment is received. Value - $334,040.20 less the $167,020.10 which Grunwald previously paid to [Cleaver Brooks] under [Cleaver Brooks]'s threat to terminate the contract.

Filing 67-8 at 1. The remaining 90 percent of the contract price was, like the schedule set out in the Proposal, to be paid in percentages when certain goals toward completion of the project were reached. Filing 67-8 at 1. The MOU then provided that

> [a]s a result of the position taken by [Cleaver Brooks] as outlined above, [Cleaver Brooks]'s suspension of work on the project effective February 27, 2023, the anticipated increased costs and project time resulting from the replacement of [Cleaver Brooks] as the boiler manufacturer on the project, and to mitigate the potential significant consequences associated with either parties' default under the project's governing contracts, Grunwald will make payments to [Cleaver Brooks] for its work on the project in the amounts and pursuant to the schedule outlined above.

Filing 67-8 at 2. The MOU then concluded by providing that the parties weren't waiving any other rights under the Sub-Contract Agreement, that the schedule would officially start "when this Contract Amendment is signed and the initial 10% of the Sub-Contract price is received," and that "all other aspects of the original Sub-Contract" Agreement would remain intact. Filing 67-8 at 2.

The parties approved and signed the MOU on June 28, 2023. Filing 64 at 9; filing 67-8 at 2. On the same date, Grunwald asked Cleaver Brooks to confirm its resumption of work on the project and, although Cleaver Brooks did so, Cleaver Brooks didn't provide Grunwald with the schedule and submittal package Grunwald had requested. Filing 73 at 38. On July 13, Cleaver Brooks invoiced Grunwald for $226,145.19—10 percent of the increased Sub-Contract price reflected in the MOU, plus Nebraska state sales tax of 5.5 percent and Omaha city sales tax of 1.5 percent, minus the

$167,020.10 that had already been paid. Filing 64 at 9; filing 68-3. Grunwald never paid the invoice. Filing 64 at 9.

Instead, on July 19, Grunwald sent Cleaver Brooks a notice of default, alleging that "Cleaver Brooks has failed to complete or diligently proceed with the subcontract." Filing 64 at 10; filing 67-10. The notice of default stated:

> On June 28, 2023, Grunwald requested confirmation from [Cleaver Brooks] that it had re-started the project and its procurement of materials necessary for boiler fabrication, requested a schedule for fabrication time and estimated delivery date and requested [Cleaver Brooks]' provision of a complete resubmittal package. Though [Cleaver Brooks] confirmed that it was re-starting its work on the project on June 28, 2023, [Cleaver Brooks] has yet to provide Grunwald with the requested scheduled or a complete submittal package which is now many months overdue.

Filing 67-10; filing 73 at 39. The notice gave Cleaver Brooks three days to correct those alleged failures. Filing 67-10 at 3; filing 73 at 39.

On July 31, 2023, Grunwald terminated the Sub-Contract Agreement. Filing 64 at 10; filing 67-11; filing 73 at 39. In its notice of termination, Grunwald claimed

> [Cleaver Brooks] has still not provided Grunwald with the requested schedule or a complete submittal package which remains several months overdue. Instead of correcting its default, [Cleaver Brooks]' response merely confirms that it intends to continue with its unjustified suspension of work on the Project which it first announced more than five (5) months ago on

> February 27, 2023. [Cleaver Brooks]' default and continued delay of the Project provides Grunwald with cause to terminate the [Sub-Contract] Agreement . . . and Grunwald has accordingly elected to terminate the [Sub-Contract] Agreement with immediate effect.

Filing 67-11 at 1. Grunwald had been in communication since early June with another vendor and contracted with that vendor to replace Cleaver Brooks on the project. Filing 64 at 11; filing 73 at 39-40.

After Cleaver Brooks was terminated, the project continued to suffer from delays. Asbestos was discovered on the site, and boiler code changes from the Army Corps of Engineers required a boiler redesign. Filing 64 at 11. Work on the project was stopped in January 2024. Filing 64 at 12; filing 67-15.

A payment bond for the project had been issued by defendant Amerisure Insurance Company. Filing 64 at 13; filing 67-18 at 1; filing 67-19. Generally, the bond guaranteed payment for labor, materials, and equipment used in performing the Sub-Contract Agreement to anyone who had contracted with Grunwald to provide them. Filing 64 at 13. After being terminated, Cleaver Brooks submitted a claim to Amerisure on the bond, but Amerisure denied the claim. Filing 64 at 14. Amerisure explained:

> Amerisure is not an arbiter of reasonable factual and/or legal disputes. After reviewing the documentation and position provided by both Grunwald and Cleaver Brooks, it appears that a reasonable legal dispute exists between the parties as to which contract provisions control payment, amongst other things. Further, it appears a reasonable factual dispute exists between the parties as to the amount owed, if any, to Cleaver Brooks for the reasons outlined above. Therefore, your claim is herein denied.

Filing 67-22 at 3.

Cleaver Brooks sued Grunwald and Amerisure for breach of contract and action on the bond, respectively. Filing 1. Grunwald counterclaimed for breach of contract. Filing 30 at 10-19. Cleaver Brooks moves for summary judgment on its claims and against the counterclaim. Filing 63.

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC,*

656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## III. DISCUSSION

### 1. CLEAVER BROOKS' BREACH OF CONTRACT CLAIM

In order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty. *Morris v. Dall*, 26 N.W.3d 304, 312 (Neb. 2025).[2] Cleaver Brooks argues that it is entitled to summary judgment on its breach of contract claim against Grunwald because (1) The Sub-Contract Agreement incorporated the Proposal, including the milestone-based payment schedule that Grunwald breached; and (2) the MOU created new, binding payment terms that Grunwald also breached. *See* filing 66. The Court disagrees with Cleaver Brooks on the first point, but agrees on the second.

#### (a) Incorporation of the Proposal

In Nebraska, when parties have executed a written document that expresses all of the terms of their agreement, the writing is considered completely integrated and the parties cannot rely on other evidence to vary the terms of the writing (with limited exceptions not present here). *See Rowe v. Allely*, 507 N.W.2d 293, 296 (Neb. 1993); *Troia Fam. Ltd. P'ship v. Kool*, No. A-09-356, 2010 WL 481039, at *3 (Neb. Ct. App. Feb. 9, 2010). Whether a writing

---

[2] When neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits. *See BBSerCo, Inc. v. Metrix Co.*, 324 F.3d 955, 960 n.3 (8th Cir. 2003).

is completely integrated is determined by the Court, which shapes how to interpret the agreement and the application of the parol evidence rule. *Leo A. Daly Co. v. Omaha-Douglas Pub. Bldg. Comm'n*, 324 N.W.2d 252, 256-57 (Neb. 1982) (quoting Restatement (Second) of Contracts § 209 (1981)).

The Nebraska Supreme Court has identified three tests that can be applied to determine if an agreement is completely integrated in a writing: (1) Was the contract complete; did it include the whole or only part of the transaction? (2) Does the evidence outside the writing vary or controvert the written terms? And, (3) Was the writing intended to cover the whole transaction, as shown by the conduct and language of the parties and the surrounding circumstances? *Troia*, 2010 WL 481039, at *4 (quoting *Cleasby v. Leo A. Daly Co.*, 376 N.W.2d 312, 317 (Neb. 1985)); *see also Traudt v. Neb. Pub. Power Dist.*, 251 N.W.2d 148, 151 (Neb. 1977).

The Court previously determined that the Sub-Contract Agreement itself was clearly not a completely integrated expression of the parties' agreement, because several material terms were not contained within its four corners. Filing 26 at 6. Accordingly, the Sub-Contract Agreement *necessarily* incorporated at least some terms of the Proposal. Filing 26 at 6. But, the Court found, extrinsic evidence was admissible to prove which specific terms from the Proposal were part of the parties' agreement, so further factual development was warranted. Filing 26 at 7.

Cleaver Brooks' argument rests on inclusion of the phrase "including applicable commercial terms" in the executed Sub-Contract Agreement. *See* filing 66 at 5. Cleaver Brooks points to email discussions between the parties' respective project managers leading up to execution of the Sub-Contract Agreement, claiming they "confirmed that the entire Proposal—or at the very least the milestone-payment schedule and cancellation schedule—were

incorporated into the Subcontract Agreement." Filing 66 at 7. But the Court's review of that evidence indicates that the one thing definitively *not* incorporated was the milestone payment schedule.

One of the first issues that Cleaver Brooks raised with Grunwald, after Grunwald offered the draft Sub-Contract Agreement, was that the milestone payment schedule was missing. *See* filing 64 at 4; filing 73 at 29-30. Grunwald indicated it was willing to discuss the schedule. *See* filing 64 at 4-5; filing 73 at 30. Cleaver Brooks also indicated that it was willing to discuss the schedule. *See* filing 73 at 30; filing 67-5 at 1. Internally, Cleaver Brooks' project manager acknowledged that milestone payments were at the time "not reflected in this document." Filing 73 at 31; filing 72-3 at 3. The additional phrase "including applicable commercial terms" was proffered to Grunwald specifically in the context, not of the payment schedule, but of "things that are specific to boiler equipment, like maintaining water quality for warranty, etc." Filing 67-6 at 2; filing 67-6 at 2.[3]

And if there was any doubt about whether the "applicable commercial terms" encompassed milestone payments, it was dispelled after Grunwald agreed to add "applicable commercial terms" to the Sub-Contract Agreement: On the same day, Cleaver Brooks' project manager contacted Grunwald again saying he "forgot to ask" whether Grunwald would accept milestone payments. Filing 73 at 33; filing 67-5 at 1. The only reasonable construction of that question is that Cleaver Brooks' project manager did *not* understand

---

[3] Grunwald suggests that the presentation of this language was a bad-faith attempt on Cleaver Brooks' part to "sneak their terms and conditions into the Sub-Contract Agreement . . . without obtaining Grunwald's actual, knowing consent." Filing 71 at 6-7. But the record, in the Court's view, is equally consistent with good-faith miscommunications and misunderstandings between parties anxious to reach a deal.

Grunwald's acceptance of the phrase "including applicable commercial terms" as accepting a milestone payment schedule. And that understanding was correct, because the resulting messages between Grunwald's project manager and VP of construction confirm that while they knew Cleaver Brooks wanted a milestone payment schedule, they didn't believe they had already agreed to one. *See* filing 67-1 at 7, 13-14; *see* filing 67-2 at 10. The parties have directed the Court to nothing, and the Court has found nothing, indicating whether or how that lingering issue was addressed again before the Sub-Contract Agreement was executed.[4]

Cleaver Brooks also suggests that the entire Proposal was incorporated into the Sub-Contract Agreement because the Proposal is specifically referred to. *See* filing 66 at 9. But the Court implicitly rejected this argument at the pleading stage, and remains unconvinced that merely *citing* the Proposal was sufficient to incorporate it entirely into the Sub-Contract Agreement without more precise language to that effect. Cleaver Brooks apparently recognizes that, because it again falls back to the phrase "including applicable commercial

---

[4] Grunwald suggests that Cleaver Brooks' willingness to compromise, after Cleaver Brooks stopped work on the project, indicates Cleaver Brooks' understanding at that time that the Sub-Contract Agreement didn't support its claims. Grunwald insists that:

> By its conduct after entering into the Sub-Contract Agreement, it is clear that Plaintiff did not consider the milestone payments provided for in the Proposal to have been incorporated into the Sub-Contract Agreement. Had Plaintiff thought otherwise, it certainly would not have seen any need to negotiate and amend the Sub-Contract to provide for milestone payments.

Filing 71 at 9. But the same could be said of Grunwald's willingness to negotiate and provide partial payment or a revised payment schedule. The Court declines to read any concessions into the efforts of two motivated parties to salvage their working relationship before resorting to litigation.

terms" as indicating that the reference to the Proposal was intended to incorporate it entirely. *See* filing 66 at 10.

The load-bearing language of Cleaver Brooks' entire incorporation argument is "including applicable commercial terms," and those words can't bear the weight. They only beg the question of which terms are "applicable." Cleaver Brooks' task following the Court's ruling on Grunwald's motion to dismiss was to discover evidence suggesting that the "applicable commercial terms" included the milestone payment schedule. But the evidence, to the extent it establishes anything clearly, goes the other way.

(b) Memorandum of Understanding

The MOU provides Cleaver Brooks with surer support. As described above, the MOU was agreed to in an attempt to resolve the dispute that had arisen between the parties over whether milestone payments were part of their agreement. *See* filing 67-8 at 1. And in the MOU, Grunwald expressly agreed to make payments to Cleaver Brooks pursuant to the milestone payment schedule contained in the MOU. *See* filing 67-8 at 2.

Grunwald's arguments to the contrary are unsupported by the language of the MOU. Grunwald prefaces its argument by insisting that the MOU "did not amend the Sub-Contract Agreement in any way." Filing 71 at 10. But the MOU itself says that its new payment schedule "will officially start when this *Contract Amendment* is signed and the initial 10% of the Sub-Contract price is received." Filing 67-8 at 2 (emphasis supplied). Grunwald also tries to parse the MOU into different sections, and asserts that the final section—which, generally, preserved the remainder of the Sub-Contract Agreement and specified when the MOU would come into effect—was the only part that represented a binding agreement between the parties.

That argument fails for a number of reasons. First, if the obligations of the parties under the MOU were limited to the final section, the MOU wouldn't actually have done anything. The final section, in its entirety, read:

- Grunwald and Cleaver Brooks continue to reserve all of their rights arising under their original Sub-Contract and neither waives any other rights available to them by the original Sub-Contract by their execution hereof and/or their performance in accordance herewith.

- The schedule will officially start when this Contract Amendment is signed and the initial 10% of the Sub-Contract price is received.

- All other aspects of the original Sub-Contract attached hereto remain intact.

Filing 67-8 at 2. So the first and last paragraphs of the section simply re-affirmed the Sub-Contract Agreement to which the parties were already bound, and the middle paragraph set a commencement date for a "schedule" that, by Grunwald's reasoning, it wasn't legally obliged to follow.

But a contract must receive a reasonable construction and be construed as a whole, and if possible, effect must be given to every part of the contract. *Acklie v. Greater Omaha Packing Co.*, 944 N.W.2d 297, 305 (Neb. 2020); *see also Brock v. Lueth*, 4 N.W.2d 285, 290 (Neb. 1942) ("[i]f a contract admits of more than one construction, one of which will render it inefficacious or nullify it, that construction should be adopted which will carry it into effect"). Grunwald's proposed construction of the MOU is simply unreasonable.

Rather, taken as a whole, the meaning of the MOU is clear. The MOU is, as Grunwald notes, divided into sections—four sections, specifically. The first section described the parties' disagreement over whether milestone payments should have been made. Filing 67-8 at 1. The second section listed Cleaver Brooks' demands for the contract price and milestone payments. Filing 67-8 at 1. The third section contained Grunwald's response to Cleaver Brooks' demands, in which Grunwald expressly agreed to "make payments to [Cleaver Brooks] for its work on the project in the amounts and pursuant to the schedule outlined above" in the second section. *See* filing 67-8 at 2. And the final section preserved the rest of the Sub-Contract Agreement and set the start date for the MOU's revised payment schedule. Filing 67-8 at 2.

The parties had a disagreement over whether the Sub-Contract Agreement required milestone payments, and that agreement was resolved with Grunwald's assent to amending the Sub-Contract Agreement and adopting a new payment schedule that included a new total price and milestone payments.[5]

(c) Breach

From that conclusion, it follows that Grunwald breached the Sub-Contract Agreement, as amended by the MOU, by not making payments pursuant to the milestone payment schedule and, after Cleaver Brooks

---

[5] The Court notes that there is *one* arguable ambiguity in the MOU: Although the MOU established a new total price of $3,674,442, the first milestone in the payment schedule was based on 10 percent of the old contract price—$334,040.20. *See* filing 67-8 at 1; *see also* filing 67-7. Were the parties disagreeing about the payment required at the first milestone, Grunwald might have an argument for the lower amount. But the discrepancy is immaterial given that Grunwald didn't pay either amount.

suspended its work, terminating the agreement based on Cleaver Brooks' alleged non-performance.

Grunwald's only substantive argument to the contrary seems to be that the Sub-Contract Agreement contained a "pay-if-paid" clause making Grunwald's receipt of payment from Spees-Hernandez a condition precedent to Grunwald's obligation to pay Cleaver Brooks. Filing 71 at 13-16. Specifically, Grunwald points to the Sub-Contract Agreement's payment schedule, in which Grunwald agreed to include the value of Cleaver Brooks' work in its monthly estimate to Spees Hernandez and pay Cleaver Brooks' invoices on a monthly basis, but that Cleaver Brooks wouldn't have a claim against Grunwald if Spees-Hernandez withheld funds. *See* filing 71 at 15 (citing filing 67-4 at 2). So, Grunwald claims, because Spees-Hernandez didn't pay Grunwald, Grunwald didn't have to pay Cleaver Brooks, and Cleaver Brooks' cessation of work was unjustified. *See* filing 71 at 13-16.

But that argument fails for several reasons. First, the Court isn't convinced that the language Grunwald relies on is really a pay-if-paid clause.

> A typical "pay-when-paid" clause might read: "Contractor shall pay subcontractor within seven days of contractor's receipt of payment from the owner." Under such a provision in a construction subcontract, a contractor's obligation to pay the subcontractor is triggered upon receipt of payment from the owner. Most courts hold that this type of clause at least means that the contractor's obligation to make payment is suspended for a reasonable amount of time for the contractor to receive payment from the owner.
>
> A typical "pay-if-paid" clause might read: "Contractor's receipt of payment from the owner is a condition precedent to contractor's obligation to make payment to the subcontractor; the

> subcontractor expressly assumes the risk of the owner's nonpayment and the subcontract price includes this risk." Under a "pay-if-paid" provision in a construction contract, receipt of payment by the contractor from the owner is an express condition precedent to the contractor's obligation to pay the subcontractor. A "pay-if-paid" provision in a construction subcontract is meant to shift the risk of the owner's nonpayment under the subcontract from the contractor to the subcontractor.

*Miller Insulation, Co. v. Beatrice Biodiesel, LLC*, No. 4:08CV3159, 2009 WL 3786082, at *4 (D. Neb. Nov. 10, 2009) (quoting *MidAmerica Const. Mgmt. Co., Inc. v. Mastec N. Am., Inc.*, 436 F.3d 1257 (10th Cir. 2006)).

But there's no language in the Sub-Contract Agreement that expressly creates a condition precedent to Grunwald's payment obligations. *See, e.g.*, *Miller Insulation*, 2009 WL 3786082, at *4 (clause was pay-if-paid when it stated that "[r]eceipt of payment for [subcontractor's] work by [contractor] shall be a condition precedent to the right of [subcontractor's] to receive payment from [contractor]. [Subcontractor] acknowledges that it relies on . . . the General Contractor, not [contractor] for the payment of [its] work").

> Whether language in a contract is a condition precedent depends on the parties' intent as gathered from the language of the contract. The words "as a condition for" are clearly language intended to create a condition precedent. Terms such as "if," "provided that," "when," "after," "as soon as," "subject to," "on condition that," or some similar phrase are evidence that performance of a contractual provision is a condition; however, an intention to make a duty conditional may be manifested by the

> general nature of an agreement, as well as by specific language. Where the parties' intent is not clear, the language is generally interpreted as promissory rather than conditional.

*Dick v. Koski Pro. Grp.*, 950 N.W.2d 321, 357 (Neb. 2020) (citations omitted).

Here, the language Grunwald relies on arguably conditions Grunwald's performance on Cleaver Brooks' compliance with the contract's requirement that Cleaver Brooks submit timely applications for payment. But the provision has little if any language conditioning Grunwald's performance on Spees-Hernandez, much less the kind of clarity necessary to establish a condition precedent. Grunwald has identified no other evidence suggesting that the parties intended to agree to a condition precedent in that regard. The provision Grunwald relies on is at best a pay-when-paid clause—and, in fact, in the MOU, Grunwald's stated position was that "it is only obligated to issue payment to [Cleaver Brooks] in accordance with *pay-when-paid provisions* within the Subcontract." Filing 67-8 at 1 (emphasis supplied).

But beyond that, even if the Sub-Contract Agreement did include such a condition precedent, the MOU modified the Sub-Contract Agreement. It is true that the MOU preserved "other aspects" of the Sub-Contract Agreement, but Grunwald's acceptance of the payment schedule in the MOU isn't "[an]other aspect"—it's the specific aspect of the Sub-Contract Agreement that was amended. The gravamen of the parties' dispute was Cleaver Brooks' insistence on milestone payments while Grunwald relied on the Sub-Contract Agreement's payment provision standing alone. The MOU resolved that dispute by plainly stating that "Grunwald will make payments to Cleaver Brooks for its work on the project in the amounts and pursuant to the schedule outlined above." That promise wasn't conditioned on anything.

Grunwald offers no other basis to conclude that it met its obligations under the MOU, or that its termination of the Sub-Contract Agreement was justified. Accordingly, Cleaver Brooks has established both the terms of the parties' agreement flowing from the MOU, and Grunwald's breach of its duties under that agreement. There are no genuine issues of material fact and Cleaver Brooks is entitled to judgment as a matter of law on those issues.

(d) Damages

Cleaver Brooks seeks damages in the amount of $384,146—15 percent of the adjusted contract price from the MOU pursuant to the Proposal, which provided a cancellation schedule for liquidated damages, minus the partial payment Grunwald already made. Filing 66 at 13-14. The Court has already rejected Grunwald's argument that the MOU didn't amend the Sub-Contract Agreement and adjust the contract price.

The problem is the cancellation schedule. Unlike the milestone payment schedule, very little in the record suggests one way or the other whether the cancellation schedule from the Proposal was incorporated into the Sub-Contract Agreement. Grunwald's project manager admitted at his deposition that he understood what Cleaver Brooks was asking for by including the cancellation schedule in the Proposal. Filing 67-1 at 7. But there's no other parol evidence that provides any clarity about whether it was actually incorporated into the parties' agreement.

In other words, there are still genuine issues of material fact as to whether the cancellation schedule establishes Cleaver Brooks' damages. And Cleaver Brooks has argued no other basis to calculate damages. *See* filing 66 at 13-14. So, while the Court can find as a matter of law that Grunwald is liable

for breach of contract, the Court can only partially grant Cleaver Brooks' motion for summary judgment.[6] The issue of damages remains to be decided.

### 2. CLAIM AGAINST AMERISURE BOND

Amerisure has not separately responded in opposition to Cleaver Brooks' motion, so the Court infers that Amerisure's defense rests on Grunwald's liability. Accordingly, should Cleaver Brooks prove its damages, Amerisure is almost certainly liable on its bond. But in the absence of a judgment as to damages, any other ruling on this claim is premature.

### 3. GRUNWALD'S COUNTERCLAIM

Grunwald's counterclaim for breach of contract is premised on Cleaver Brooks' alleged nonperformance of the Sub-Contract Agreement. *See* filing 30 at 14-19. Cleaver Brooks argues that the counterclaim should be dismissed because Cleaver Brooks didn't breach the parties' agreement and, in any event, Grunwald cannot establish causation or damages. Filing 66 at 16.

The Court need go no farther than breach. As explained above, Grunwald was obliged by the MOU to make payments that it failed to make, excusing Cleaver Brooks' subsequent non-performance. Grunwald's brief defends its evidence of damages, but makes no argument for Cleaver Brooks' breach of contract that doesn't rest on its construction of the parties' agreement. *See*

---

[6] Rule 56(g) permits the Court to enter an order stating the material facts that aren't in dispute and treat them as established in the case, even if the Court can't grant all the relief requested by the summary judgment motion.

filing 71 at 12-13.[7] Accordingly, any such argument has been waived by Grunwald's failure to assert it in opposing summary judgment. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 734-35 (8th Cir. 2009).

Because there are no genuinely disputed material facts sufficient to establish that Cleaver Brooks breached the parties' agreement, Grunwald's counterclaim will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Cleaver Brooks' motion for summary judgment will be granted in part. Grunwald breached the parties' agreement. Grunwald and Amerisure are liable for any damages Cleaver Brooks can prove resulting from the breach, potentially including liquidated damages if Cleaver Brooks can demonstrate that its cancellation schedule was incorporated into the agreement. Cleaver Brooks did not breach the parties' agreement, and Grunwald's counterclaim will be dismissed.

Further proceedings will be required on the issue of Cleaver Brooks' damages. Progression on that issue—and an inquiry into the parties' interest in settlement—is referred to the Magistrate Judge.

IT IS ORDERED:

1. Cleaver Brooks' motion for summary judgment (filing 63) is granted in part, as set forth above.

---

[7] Grunwald does not, for instance, argue that it is entitled to damages on its counterclaim for any breach of contract that is alleged to have occurred *before* the parties executed the MOU. *See* filing 71 at 12-13.

2. Grunwald's liability for breach of contract is established as a matter of law.

3. Grunwald's counterclaim is dismissed.

4. Cleaver Brooks' motion to exclude evidence of undisclosed damages (filing 79) is denied as moot.

Dated this 5th day of August, 2026.

BY THE COURT:

John M. Gerrard
Senior United States District Judge